## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Peggy C. O.,                                    Case No. 20-cv-1373 (TNL)

      Plaintiff,

v.                                                      **ORDER**

Kilolo Kijakazi,
Acting Commissioner of Social Security,[1]

      Defendant.

---

Edward C. Olson, Disability Attorneys of Minnesota, 331 Second Avenue South, #890, Minneapolis, MN 55401 (for Plaintiff); and

Tracey Wirmani, Special Assistant United States Attorney, Social Security Administration, Office of the General Counsel, 1301 Young Street, Suite 350, Mailroom 104, Dallas, TX 75202 (for Defendant).

---

## I. INTRODUCTION

Plaintiff Peggy C. O. brings the present case, contesting Defendant Commissioner of Social Security's denial of her applications for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.*, and supplemental security income ("SSI") under Title XVI of the same, 42 U.S.C. § 1381 *et seq.* The parties have consented to a final judgment from the undersigned United States Magistrate Judge in accordance with 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, and D. Minn. LR 72.1(c).

---

[1] The Court has substituted Acting Commissioner Kilolo Kijakazi for Andrew Saul. A public officer's "successor is automatically substituted as a party" and "[l]ater proceedings should be in the substituted party's name." Fed. R. Civ. P. 25(d).

This matter is before the Court on the parties' cross-motions for summary judgment. ECF Nos. 34, 37.  Being duly advised of all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Plaintiff's Motion for Summary Judgment, ECF No. 34, is **DENIED** and the Commissioner's Motion for Summary Judgment, ECF No. 37, is **GRANTED**.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI asserting that she has been disabled since October 2013 due to, among other impairments, generalized anxiety disorder and major depressive disorder.[2]  Tr. 107, 120, 133, 135, 137, 153, 169, 171.  Her applications were denied initially and again upon reconsideration.  Tr. 10, 118, 131, 133, 135, 150, 166, 169, 171.

Plaintiff appealed the reconsideration of her DIB and SSI determinations by requesting a hearing before an administrative law judge ("ALJ").  Tr. 192.  The ALJ held a hearing in March 2019,[3] and issued an unfavorable decision.  Tr. 10, 35-81.  After receiving an unfavorable decision from the ALJ, Plaintiff requested review from the Appeals Council, which was denied.  Tr. 1-5.

Thereafter, Plaintiff filed the instant action, challenging the ALJ's decision. Compl., ECF No. 1.  The parties have filed cross motions for summary judgment.  ECF Nos. 34, 37.  This matter is now fully briefed and ready for a determination on the papers.

---

[2] Although Plaintiff also alleged physical impairments, this action is limited to her mental impairments.  *See* Tr. 107, 120, 137, 153.
[3] A hearing was initially set for October 2018, but continued so that Plaintiff could obtain representation.  Tr. 10; *see* Tr. 83, 85-89, 103.

### III. MEDICAL RECORDS

Plaintiff has a history of depression, anxiety, and panic attacks. *See, e.g.*, Tr. 875, 880-81, 893. Among other medications, Plaintiff has been prescribed Lexapro[4] and Ativan[5]. *See, e.g.*, Tr. 811, 814, 879, 882, 893.

**A. 2014**

In mid-March 2014, Plaintiff was seen in the emergency room for a refill of Lexapro following a 28-day alcohol treatment program. Tr. 811, 814. She was noted to "ha[ve] a normal mood and affect" and both her behavior and judgment were normal. Tr. 813. Plaintiff was given a limited refill and directed to follow up with the clinic in the next few days. Tr. 813-14.

At the end of June, Plaintiff was seen for medication management. Tr. 890. Plaintiff reported that "[h]er anxiety has been better, still has lots of work stress." Tr. 890. Plaintiff was "interested in talking with a therapist to help with her anxiety." Tr. 890. Plaintiff was alerted and oriented, with an appropriate affect, normal speech, organized thoughts, and good insight. Tr. 891. An anxiety screening revealed "moderate anxiety." Tr. 891. Plaintiff's Ativan prescription was renewed for use as needed and she was referred for therapy. Tr. 892. *See infra* Section III.F.

When Plaintiff's medications were refilled at the end of September, she was noted to be doing well. Tr. 925 ("She feels well on the medications.").

---

[4] Lexapro is a brand name for escitalopram, a medication used to treat depression and generalized anxiety disorder. *Escitalopram*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a603005 html (last accessed Mar. 14, 2022).
[5] Ativan is a brand name for lorazepam, a medication "used to relieve anxiety." *Lorazepam*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a682053.html (last accessed Mar. 14, 2022).

### B. 2015

When Plaintiff's medications were next filled in mid-February 2015, she reported that she thought her medications were "throwing off her body" as she experienced an additional menstrual cycle during the past month. Tr. 939. Plaintiff was noted to have a normal mood and affect and her speech was fluent and non-pressured. Tr. 941. Plaintiff's medications were renewed. Tr. 941.

Towards the middle of June, Plaintiff reported that her medications were "not working as well as they had at first." Tr. 950. Plaintiff was "feeling very anxious" and could not sleep. Tr. 950. Plaintiff also reported "having trouble leaving the house" and gaining weight due to eating poorly. Tr. 950. Approximately a week later, Plaintiff presented to the emergency room with complaints of anxiety following a weekend of binge drinking. Tr. 955, 822; *see* Tr. 961. Plaintiff reported that she was taking her medications, but both Buspar[6] and Ativan upset her stomach. Tr. 955, 822. Plaintiff was subsequently hospitalized and began an out-patient treatment program. Tr. 965; *see* Tr. 971; *see also* Tr. 741-59. Plaintiff later participated in an intensive residential treatment services[7] program for approximately two months. Tr. 984; *see* Tr. 763-91.

As part of the intake process for the intensive residential treatment services program, Plaintiff reported "a loss of interest in activities and hobbies, increase in appetite which

---

[6] Buspar is a brand name for buspirone, a medication "used to treat anxiety disorders or in the short-term treatment of symptoms of anxiety." *Buspirone*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a688005 html (last accessed Mar. 14, 2022).

[7] "Intensive residential treatment services (IRTS) are time-limited mental health services provided in a residential setting." *Intensive Residential Treatment Services (IRTS)*, Minn. Dept. of Human Servs., https://www.dhs.state mn. us/main/idcplg?IdcService=GET_DYNAMIC_CONVERSION&RevisionSelectionMethod=LatestReleased&dDoc Name=id_058155 (last accessed Mar. 14, 2022).

lead [sic] to a 25 pound weight gain in two months, inability to sleep, low mood, racing thoughts, some difficulties concentrating, daily anxiety and daily panic attacks." Tr. 765. Plaintiff reported experiencing "anxiety every day." Tr. 765. Plaintiff's mood was depressed and her affect was congruent with her mood. Tr. 766. Plaintiff was noted to be appropriately groomed and had good eye contact. Tr. 765-66. Her "speech was rapid" with "appropriate volume and tone." Tr. 766. She "was cooperative and engaged in [the] assessment," and "answered all questions appropriately." Tr. 766. Her "[t]hought process was linear." Tr. 766.

While participating in the intensive residential treatment services program, Plaintiff was noted to "go[] to the 'Y' on an almost daily basis" and had "started playing tennis with another resident." Tr. 768. Plaintiff "spen[t] most of her time, at the facility, either in the smoking area or her room," socializing with others while in the smoking area and resting in bed when in her room. Tr. 768. Plaintiff "report[ed] that she likes to maintain a schedule and complete one task at a time," preferring "to add in reward activities between daily housekeeping tasks." Tr. 768. Plaintiff was "observed to keep her bedroom clean[] and complete household tasks such as laundry and her house job." Tr. 768. Plaintiff was noted to have a driver's license, but did not currently "have a vehicle." Tr. 769. Plaintiff was familiar with public transportation and used taxis to get to appointments. Tr. 769.

Plaintiff was discharged from the intensive residential treatment services program in mid-September. Tr. 785. Among other things, it was noted that Plaintiff "ha[d] shown that she can follow through and complete tasks, even when she doesn't really want to." Tr. 786. Treatment staff supported her discharge, noting that Plaintiff "ha[d] shown that she

is ready to transition to a lower level of care where she can practice her independent living skills and coping strategies."  Tr. 786.

In mid-October, Plaintiff was next seen for a medication refill.  Tr. 980.  It was noted that she was currently living in another city and would be moving back in with her significant other at the end of the month.  Tr. 980; *see* Tr. 984.  She was "very anxious right now since not living in her home."  Tr. 980.  Plaintiff reported that Lexapro typically helps with her symptoms, but lately she had been "just more anxious."  Tr. 980.  Plaintiff had been unable to continue therapy, *see infra* Section III.F, due to a lack of transportation but intended to resume once she moved back.  Tr. 980.  Plaintiff was alert and oriented with normal speech and thought processes.  Tr. 981.  She was noted to be anxious with an appropriate affect.  Tr. 981.  A depression screening resulted in moderately severe depression and an anxiety screening showed severe anxiety.  Tr. 981-82.  Plaintiff's Lexapro prescription was renewed and she was prescribed "hydroxyzine for acute anxiety symptoms."  Tr. 982.

### C. 2016

At her next medication management appointment in mid-February 2016, Plaintiff reported helping her significant other "with meat processing at their home and [had been] very busy."  Tr. 987.  Plaintiff continued to feel that Lexapro was not "helping to control [her] depression symptoms well at this time," and reported "having difficulty sleeping, lack of energy, [and] weight gain."  Tr. 987.  Plaintiff reported that she had resumed therapy, *see infra* Section III.F, which she "finds very helpful."  Tr. 987.

Plaintiff was noted to be alert and oriented with normal speech and thought processes. Tr. 988. Plaintiff's mood was depressed and her affect appropriate. Tr. 988. Plaintiff was directed to taper off Lexapro and begin Wellbutrin.[8] Tr. 989.

In early March, Plaintiff presented to the emergency room due to an unrelated condition. *See* Tr. 994-1001, 832-40. While there, Plaintiff reported "feeling increasingly depressed and hopeless as [her significant other] of 13 years suddenly ended [their] relationship." Tr. 993; *accord* Tr. 832; *see* Tr. 997, 836.

When Plaintiff was next seen approximately one month later, she requested that Lexapro be continued as "it seems to help control [her] symptoms well." Tr. 1008. Plaintiff was again noted to be alert and oriented with normal speech and thought processes. Tr. 1009. Her mood was noted to be depressed and anxious and she presented with a blunted affect. Tr. 1009.

At the beginning of August, Plaintiff was seen in connection with a medication refill. Tr. 1068. Plaintiff reported "increased anxiety as well as a downtrend in mood" due to worrying about her adolescent son, who was staying with her for the summer. Tr. 1068. Plaintiff reported that she "ha[d] stopped using her Seroquel[9] for nearly a month" so that she is able to keep an eye on her son and ensure that he does not wander off. Tr. 1068. Plaintiff's treatment provider noted that she was "mildly blunt," which was "quite in

---

[8] Wellbutrin is a brand name for bupropion, a medication "used to treat depression." *Bupropion*, Medline Plus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a695033.html (last accessed Mar. 14, 2022).

[9] Seroquel is a brand name for quetiapine, a medication which can be used in conjunction with other medications to treat depression, among other things. *Quetiapine*, Medline Plus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a698019 html (last accessed Mar. 14, 2022).

contrast to [her] PHQ-9[10] score of 19 today." Tr. 1069. Plaintiff's speech was normal and her insight was "adequate." Tr. 1069.

Towards the end of September, Plaintiff was screened for attention deficit hyperactivity disorder. Tr. 1085-90. Plaintiff "report[ed] problems with maintaining concentration and attention span" in her daily life. Tr. 1085. Plaintiff was noted to be well groomed, with appropriate attire and good hygiene. Tr. 1089. She made appropriate eye contact and her speech and thought processes were normal. Tr. 1089. Her attention/concentration were also normal. Tr. 1089. Plaintiff was noted to be depressed and anxious with a congruent affect. Tr. 1089.

### D. 2017

When Plaintiff was seen for a medication management appointment in mid-January 2017, she reported feeling "somewhat more anxious and uneasy lately" and had "a poor appetite and difficulty sleeping." Tr. 1143. Plaintiff was noted to be "alert and oriented, well groomed and appropriately dressed." Tr. 1143. Mirtazapine[11] was added to Plaintiff's medication regimen and she was directed to return in one month for a recheck. Tr. 1143.

Plaintiff returned during the first half of April. Tr. 1147. Plaintiff had "not been taking mirtazapine every night" as "[t]here have been a few times that she woke up feeling like she was choking after having strange dreams." Tr. 1147. Plaintiff inquired whether

---

[10] "The Patient Health Questionnaire, PHQ-9, is used to screen, diagnose, monitor, and measure the severity of depression." *Ramo v. Colvin*, No. 13-cv-1233 (JRT/JJK), 2014 WL 896729, at *5 n.12 (D. Minn. Mar. 6, 2014). "Scores of 15-19 indicate moderately severe major depression that warrants treatment with an antidepressant or psychotherapy." *Id.* "Scores of 20 and greater indicate severe major depression that warrants treatment with an antidepressant and psychotherapy." *Id.*

[11] "Mirtazapine is used to treat depression." *Mirtazapine*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a697009.html (last accessed Mar. 14, 2022).

she could add an additional half tablet of Lexapro on days when she was experiencing increased symptoms. Tr. 1147. While Plaintiff was "initially seen lying on the exam table with the lights off in the exam room," she was noted to be in no acute distress, with good hygiene, and was dressed appropriately. Tr. 1148. Plaintiff's PHQ-9 score of 16 was indicative of moderately severe depression and her GAD-7[12] score of 13 was indicative of moderate anxiety. Tr. 1148. It was recommended that Plaintiff take "[m]irtazapine daily rather than once in a while" and her Lexapro prescription was unchanged. Tr. 1148.

Approximately one month later, Plaintiff was seen by another provider to establish care and for a medication check. Tr. 1266. Plaintiff was "mildly flat," and "better than the PHQ-9 score of 19 she attributes [to] her mom's recent hospitalization." Tr. 1268. Her speech and thought processes were noted to be normal. Tr. 1268. Plaintiff was prescribed Seroquel to help with sleeping. Tr. 1268.

Plaintiff was next seen towards the end of October. Tr. 1149. Plaintiff was "worried that her Lexapro [wa]s no longer working and . . . wondering if she needs to switch medication." Tr. 1149. Plaintiff reported that, with premenstrual syndrome, "she becomes very irritable and very teary and she struggles doing daily activities." Tr. 1149. Plaintiff reported that "[h]er anxiety levels have been much higher lately and it has been increasing for the last 6 months." Tr. 1149. It was noted that Plaintiff had "an anxiety coach," *see*

---

[12] "The GAD-7 scale is a validated brief self-report measure to screen for [generalized anxiety disorder] and assess the severity of symptoms." Emily P. Terlizzi, M.P.H., & Maria A. Villarroel, Ph.D., *Symptoms of Generalized Anxiety Disorder Among Adults: United States, 2019*, NCHS Data Brief No. 378, Nat'l Ctr. for Health Statistics, *available at* https://www.cdc.gov/nchs/products/databriefs/db378 htm (last accessed Mar. 15, 2022) (footnote omitted). "Adults with GAD-7 scores of 0-4 are considered to have no or minimal symptoms of [generalized anxiety disorder], while those with scores of 5-9, 10-14, or 15-21 are considered to have mild, moderate, or severe symptoms, respectively." *Id.* (footnote omitted).

*infra* Section III.G, "which finally helped her get into the clinic today." Tr. 1149. Plaintiff

was again noted to be in no acute distress, with good hygiene, and dressed appropriately.

Tr. 1150. Plaintiff's mirtazapine dose was increased. Tr. 1150.

### E. 2019

Plaintiff was seen in early January 2019 for a medication check. Tr. 1287. Plaintiff

reported that Lexapro "control[led] her depression and chronic pain fairly well." Tr. 1287.

Plaintiff's depression inventory score was "high however." Tr. 1287. Plaintiff reported

that "nearly all the time she has difficulty with appetite and difficulty concentrating and

being fidgety." Tr. 1287. Plaintiff's Lexapro and mirtazapine prescriptions were

continued. Tr. 1288.

### F. Kuehl

Plaintiff began meeting with licensed psychologist David L. Kuehl, Psy.D., in mid-

July 2014. Tr. 893. Kuehl noted that Plaintiff was experiencing symptoms of "[d]epressed

mood, reduced interest/pleasure in activities, insomnia, self-esteem problems,

concentration problems, and irritability" in association with her depression. Tr. 893.

Plaintiff was similarly experiencing symptoms of "[a]nxiety, worry, difficulty relaxing,

irritability, restlessness, and fearing something bad could happen" in association with her

anxiety. Tr. 893.

Kuehl noted that Plaintiff was well groomed, dressed appropriately, and had good

hygiene. Tr. 896. Plaintiff was cooperative and made appropriate eye contact. Tr. 896.

Her speech was unremarkable and her attention/concentration were normal. Tr. 896.

Plaintiff's thoughts were organized and reality-based and she had no memory impairment.

Tr. 896. Plaintiff's mood was "appropriate, depressed and anxious." Tr. 896. Plaintiff's affect was "appropriate to [the] content of [her] speech and circumstances, full range, depressed, anxious, fearful and pleasant." Tr. 896. Plaintiff demonstrated good insight/judgment. Tr. 896. Kuehl diagnosed Plaintiff with generalized anxiety and major depressive disorder and "encouraged [her] to follow up for psychotherapy to work on coping skills to address her anxiety and depression." Tr. 897.

Plaintiff saw Kuehl on a fairly regular basis between 2014 and 2016: roughly every two weeks between August and December 2014, Tr. 911, 914, 916, 918, 922, 927, 930, 933, 936; approximately once a month between March and July 2015, Tr. 944, 947, 952, 971; and, with the exceptions of June and July, at least once per month between February and December 2016, Tr. 984, 990, 1002, 1005, 1011, 1014, 1022, 1025, 1079, 1082, 1092, 1095, 1170, 1177; *see also* Tr. 1173, 1180.

In or around the end of 2014 and into 2015, Plaintiff worked as a bartender. Tr. 936, 944. In 2016, she regularly volunteered with a local church, Tr. 984, 1002, 1014, and, in October of that year, she went out hunting and was planning a trip to Wisconsin with her significant other. Tr. 1095; *see also* Tr. 1196 ("been hunting the last several months").

Kuehl most often described Plaintiff as suffering from moderate depression. Tr. 911, 930, 990, 1005, 1014, 1022, 1025, 1079, 1092, 1095, 1177, 1180; *cf.* Tr. 1082 (moderate to severe depression); *but see* Tr. 1170, 1173 (severe depression). Plaintiff was regularly anxious and, at times, experienced an increase in her anxiety. *Compare* Tr. 911, 922, 930, 947, 990, 1005, 1014, 1022, 1025, 1079, 1082, 1095, 1177, 1180 *with* Tr. 952,

971, 1011, 1082, 1092, 1170, 1173. Plaintiff also occasionally reported experiencing panic attacks. Tr. 971, 1079, 1082; *see* Tr. 914.

Plaintiff and Kuehl often discussed Plaintiff's relationship with her significant other, including feelings of loneliness and increased depression and anxiety when he was away. Tr. 911, 918, 933, 936, 944, 952, 971, 984, 990, 1011, 1022, 1091, 1170, 1173. They also frequently discussed Plaintiff's concern over her adolescent son, his mental health, and school performance. Tr. 916, 922, 927, 947, 952, 971, 984, 990, 1082, 1095. Kuehl and Plaintiff talked through triggers, coping and relaxation strategies, and a "need for more social involvement and support." Tr. 911, 916, 927, 952, 971, 1005, 1022, 1025, 1092, 1170, 1173, 1177, 1180.

Plaintiff's mood was routinely noted to be appropriate and, most often a combination of sad, depressed, and anxious. Tr. 912, 915, 917, 919, 923, 928, 931, 934, 937, 945, 948, 953, 971, 984, 972, 985, 991, 1002, 1005, 1011, 1015, 1023, 1026, 1079, 1083, 1093, 1096, 1171, 1174, 1178, 1181. She was also frequently irritable. Tr. 917, 923, 928, 937, 945, 948, 953, 991, 1012, 1015, 1023, 1026, 1079, 1083, 1093, 1096, 1171, 1174, 1178, 1181. Her affect was consistently appropriate. Tr. 912, 915, 917, 919, 923, 928, 931, 934, 937, 945, 948, 953, 972, 985, 991, 1003, 1005, 1012, 1015, 1023, 1026, 1079, 1083, 1093, 1096, 1171, 1174, 1178, 1181.

Plaintiff's depression and anxiety were scaled using the PHQ-9 and GAD-7 assessments, respectively. Plaintiff's scores most often reflected moderately severe depression. *Compare* Tr. 985, 991, 1006, 1012, 1015, 1023, 1026, 1080, 1083, 1093, 1096, 1171, 1175, 1178, 1182 *with* Tr. 953, 972 (severe depression) *with* Tr. 938, 1003 (moderate

depression) *with* Tr. 949 (mild depression) *with* Tr. 946 (none).  Between August 2014 and April 2015, Plaintiff most often had no or mild anxiety.  *Compare* Tr. 917, 923, 928, 938, 946, 949 *with* Tr. 912 (severe anxiety) *with* Tr. 915, 919 (moderate anxiety).  Between June 2015 and December 2016, Plaintiff oscillated between severe and moderate anxiety, with her scores most often reflecting severe anxiety.  *Compare* Tr. 953, 972-73, 1007, 1013, 1016, 1081, 1094, 1096-97, 1172, 1175, 1179, 1182 (severe anxiety) *with* Tr. 985-86, 992, 1003, 1025, 1027, 1084 (moderate anxiety).

Plaintiff was consistently described as alert and oriented; engaged, cooperative, and conversational; and well groomed with appropriate attire and hygiene.  Tr. 911, 914, 918, 923, 927, 931, 934, 937, 945, 948, 952, 971, 984, 990, 1002, 1005, 1011, 1014, 1022, 1025, 1079, 1082, 1092, 1095, 1170, 1174, 1177, 1180.  She also consistently maintained appropriate eye contact and her speech was unremarkable.  Tr. 911-12, 914, 918, 923, 928, 931, 934, 937, 945, 948, 953, 971, 984, 990-91, 1002, 1005, 1011, 1014, 1022, 1025, 1079, 1082, 1092, 1095, 1170, 1174, 1177, 1181.  Although Kuehl noted that Plaintiff was distractible and had tangential thoughts during their first session and Plaintiff mentioned on at least one occasion having trouble with attention, focus, and memory, he consistently documented normal thoughts, a normal attention span, and no memory impairment. *Compare* Tr. 912, 1079 *with* Tr. 914-15, 916-17, 918-19, 923, 928, 931, 934, 937, 945, 948, 953, 971-72, 984-85, 991, 1002, 1005, 1011-12, 1014-15, 1022-23, 1025-26, 1079-80, 1082-83, 1092-93, 1095-96, 1170, 1174, 1177-78, 1181.

### G. ARMHS Services

In the first half of April 2016, Plaintiff was assessed for adult rehabilitative mental health services[13] ("ARMHS") eligibility.  *See generally* Tr. 861-66, 1126-31.  Plaintiff reported "experiencing symptoms of anxiety, panic, and depression."  Tr. 864; *accord* Tr. 1129.  Plaintiff experienced panic attacks, which she described "as feeling like acid burning through you from the inside out."  Tr. 864; *accord* Tr. 1129.  Plaintiff stated that these "attacks happen less often since learning coping skills to manage them but that she still struggles with panic related to being in public on a regular basis."  Tr. 864; *accord* Tr. 1129; *see also, e.g.*, Tr. 1290.  Plaintiff reported that she "tends to only leave her home for appointments or to volunteer at the church."  Tr. 864; *accord* Tr. 1129; *see also* Tr. 1127 (volunteering at a church in receiving donations).  Plaintiff no longer attended "church services because of the crowds."  Tr. 862.

Plaintiff "also report[ed] struggling with depression," including "no energy or motivation and loss of interest in doing things she used to enjoy."  Tr. 864.  Plaintiff reported crying at least once per day and feelings of hopelessness.  Tr. 864.  Plaintiff received "about 4 hours of sleep per night and ha[d] difficulty falling asleep."  Tr. 864.  Plaintiff described her relationship with her significant other as "good."  Tr. 862.

---

[13] "Adult rehabilitative mental health services (ARMHS) are mental health services that are rehabilitative and enable the member to develop and enhance psychiatric stability, social competencies, personal and emotional adjustment, and independent living and community skills when these abilities are impaired by the symptoms of mental illness." *Adult Rehabilitative Mental Health Services (ARMHS)*, Minn. Dep't of Human Servs., https://www.dhs.state mn.us/main/idcplg?IdcService=GET_DYNAMIC_CONVERSION&RevisionSelectionMethod=LatestReleased&dDocName=ID_058153 (last accessed Mar. 14, 2022).

Plaintiff was noted to be "slightly anxious and presented with a depressed mood." Tr. 861; *accord* Tr. 1126. She was "withdrawn and made minimal eye contact." Tr. 861; *accord* Tr. 1126. "Her grooming appeared slightly neglected." Tr. 861; *accord* Tr. 1126. "She spoke calmly with a quieter voice volume and tone," and her speech was within normal limits. Tr. 861; *accord* Tr. 1126. She "presented with appropriate attention/concentration and judgment/insight," and "was cooperative." Tr. 861; *accord* Tr. 1126. Plaintiff was assessed with social anxiety disorder and major depressive disorder, among other things, and determined to be eligible for ARMHS. Tr. 864-66, 1129-31; *see also* Tr. 1137-40, 1233.

Plaintiff's ARMHS services consisted of a mixture of one-on-one sessions in the community and her home as well as psychotherapy. *See generally* Tr. 624-733, 452-595, 1290-1343. From mid-October 2016 through January 2019, Plaintiff generally met with ARMHS personnel between one and four times per week. *See generally* Tr. 624-733, 452-595, 1290-1343; *see also* Tr. 735-36. Plaintiff's ARMHS treatment plans focused on utilizing calming skills for anxiety and panic, particularly in social situations; setting boundaries and communicating her own needs; and improving her daily living skills, including remembering appointments and organization.

### 1. Calming Skills for Anxiety & Panic

Plaintiff's treatment plans noted that she "struggles in public settings" due to "social anxiety" and "she report[ed] that it takes her several hours to prepare herself to leave the house even if it is just for a professional appointment." Tr. 596; *see also, e.g.*, Tr. 599, 600, 603, 604, 607, 607, 608, 611, 1313, 476. Plaintiff also reported that going to

15

"professional appointments is about the only time she leaves the house."  Tr. 596.

"[Plaintiff's] panic attacks cause her to isolate and stay at home."  Tr. 596; *see also* Tr. 597

("I tend to isolate at home rather than go out into the community due to my anxiety and

panic."); *see also, e.g.*, Tr. 599, 600, 604, 607, 608, 611.  Plaintiff further reported that she

"enjoys volunteering but since she has social anxiety she is unable to participate in what

she enjoys doing."  Tr. 596; *see also, e.g.*, Tr. 599, 600, 605, 609, 611.

Plaintiff was often distraught and more anxious when her significant other was

away.  Tr. 629, 707, 722, 1291, 1292, 1293, 1294; *see* Tr. 1309, 1316.  Plaintiff experienced

"racing thoughts" when out in public and had "a hard time reading social cues because [she

thought] that people [we]re being aggressive."  Tr. 617.  "Large crowds, including family

and friends[, were] hard for [her]" and she was only able to "be in those situations for short

periods of time before [she] start[ed] feeling anxious."  Tr. 617; *see also, e.g.*, Tr. 664, 695,

706, 703, 464, 467, 468, 481, 483.  Plaintiff occasionally struggled with asking for

assistance when shopping in stores.  Tr. 476, 483, 485.  At the end of March 2017, one of

Plaintiff's ARMHS workers noted "[t]his was the first session [she] was able to get

[Plaintiff] out of the house just to do something fun in the community."  Tr. 685.

There were times in which Plaintiff reported "very high" anxiety.  Tr. 711, 712, 713;

*see also* Tr. 1303, 499.  She occasionally had panic attacks.  *See, e.g.*, Tr. 700, 1335.

Plaintiff also at times felt "too depressed to leave [her] apartment" or "even leave [her]

bed."  Tr. 617.  In early September 2017, Plaintiff stated that "she . . . felt very depressed

lately."  Tr. 726.  "She [wa]s having a hard time adjusting to the school schedule for her

son" and "stated it ha[d] been hard to even get up and shower or complete household tasks."

16

Tr. 727.  In August 2018, Plaintiff reported that "her anxiety [wa]s overshadowing her depression lately, making it difficult to engage in necessary tasks such as grocery shopping alone or be[ing] around others."  Tr. 1319.

Ultimately, however, Plaintiff was largely successful in meeting the objectives for demonstrating and utilizing calming skills.  *See, e.g.*, Tr. 599, 603, 607, 611, 616.  She was able to demonstrate and utilize calming skills both with prompting and independently.  Tr. 607, 611.  Plaintiff expressed a desire "to continue practicing calming skills to be able to feel more in control of [her] body and mental health symptoms when out in public."  Tr. 613; *see also, e.g.*, Tr. 618-19.

### 2.  Setting Boundaries & Communicating Own Needs

Plaintiff reported that she had "a hard time asking for help[] due to boundaries" and "tend[ed] to let others walk all over [her]."  Tr. 601; *see also, e.g.*, Tr. 603, 605, 605, 620. A lack of boundaries caused "confrontation and anxiety" for Plaintiff.  Tr. 601; *see also, e.g.*, Tr. 603, 605.  Plaintiff reported that her "anxiety is a physical barrier when it comes to face to face or phone conversations" and she struggled with confrontation.  Tr. 604; *see also, e.g.*, Tr. 608.

Plaintiff "struggle[d] with conflict resolution skills, [and] often times . . . [did] not want to attempt to work on [them] because it creates anxiety."  Tr. 603.  Conflict-resolution skills were subsequently removed from her treatment plan as "when it is brought up in session, . . . [she] quickly shuts i[t] down, stating she is not ready to work on this skill." Tr. 607.  In its place, Plaintiff wanted to work on verbally communicating her wants and needs.  Tr. 607.

17

Here too, Plaintiff was ultimately largely successful in meeting the objectives related to verbally communicating her wants and needs. *See, e.g.*, Tr. 611, 617. Plaintiff wanted to continue working on this skill as "she fe[lt] like she is holding back a lot" and "has a hard time saying no or does not like to ask for help because she does not want to bother people." Tr. 611; *see also, e.g.*, Tr. 614, 617.

### 3. Daily Living Skills

Approximately two years into the program, Plaintiff indicated "that she would like to improve her organization, keeping up with her appointments and housework." Tr. 611; *see also, e.g.*, Tr. 612, 616. Plaintiff also had "a hard time remembering to complete important tasks such as getting the mail, appointment[s], paying rent or taking [her] medication." Tr. 617; *see also* Tr. 1321. Plaintiff "want[ed] to be able to train [her] brain to focus and complete tasks." Tr. 612; *see also, e.g.*, Tr. 616, 618. In the end, Plaintiff was largely successful in meeting the objectives related to daily living as well. Tr. 616.

### 4. Other Observations

During a periodic review approximately one year into the program, Plaintiff "appeared slightly anxious" during the interview. Tr. 1132. She was depressed and her affect was congruent to her mood. Tr. 1132. Plaintiff "spoke calmly and deliberately." Tr. 1132. Plaintiff's grooming, eye contact, speech, attention, judgment and insight, and thought processes were normal or unremarkable. Tr. 1132. Short-term memory problems, however, were noted. Tr. 1133.

18

## IV. OPINION EVIDENCE

### A. Kuehl

In mid-November 2016, Kuehl completed a questionnaire related to Plaintiff's mental health. *See generally* Tr. 1120-23. Kuehl listed Plaintiff's diagnoses as, among other things, generalized anxiety disorder and major depressive disorder. Tr. 1120. Kuehl indicated Plaintiff experienced the following symptoms: anhedonia, appetite disturbance, sleep disturbance, decreased energy, difficulty concentrating or thinking, hyperactivity, easy distractibility, motor tension, apprehensive expectation, vigilance and scanning, persistent irrational fear resulting in avoidance, recurrent severe panic attacks, depressed mood, irritability, self-esteem issues, and chronic worry/anxiety/fear. Tr. 1120.

Kuehl opined on Plaintiff's ability to perform certain work-related activity. Kuehl opined that Plaintiff was seriously limited but not precluded in her abilities to understand, remember, and carry out very short and simple instructions; maintain regular attendance and punctuality; sustain an ordinary routine without special supervision; work in coordination with or close proximity to others without being unduly distracted; make simple work-related decisions; ask simple questions or request assistance; get along with coworkers or peers; and be aware of normal hazards and take appropriate precautions. Tr. 1122-23.

Plaintiff was unable to meet competitive standards in her ability to remember work-like procedures; maintain attention for two-hour segments; accept instructions and respond appropriately to supervisors; respond appropriately to changes in a routine work setting; and deal with normal work stress. Tr. 1122. Plaintiff was likewise unable to meet

19

competitive standards with regard to her abilities to understand, remember, and carry out detailed instructions; set realistic goals or make plans independently; and deal with the stress of semiskilled and skilled work.  Tr. 1123.

Plaintiff had no useful ability to function with respect to her abilities to complete a normal workday and workweek without interruptions from psychological symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Tr. 1122.  Kuehl further opined that Plaintiff would be absent from work more than four times per month due to her mental health.  Tr. 1123.  When asked whether Plaintiff's mental impairments had lasted or could be expected to last at least 12 months, Kuehl checked the "Unknown" box.  Tr. 1123.

### B.  State Agency Psychological Consultants

The state agency psychological consultants similarly assessed Plaintiff's residual functional capacity on initial review and reconsideration.  *Compare* Tr. 114-16, 127-29 *with* Tr. 146-48, 162-64.  They opined that Plaintiff had no memory or understanding limitations.  Tr. 114, 127, 114, 162.  They also opined that Plaintiff "retain[ed] the ability to concentrate and attend to 3-4 step and limited detailed tasks" and "would have moderate limitations for complex and technical tasks."  Tr. 115; *accord* Tr. 128, 147, 163; *see also* Tr. 114-15, 127-28, 147, 163.

As for Plaintiff's ability to interact with others, the state agency psychological consultants opined that she could "tolerate superficial interactions with coworkers and supervisors," but "would do best without regular public contacts."  Tr. 115; *accord* Tr. 128; *see* Tr. 147 ("[S]he would do best without regular and sustained public contacts."); *accord*

Tr. 163; *see also* Tr. 115, 128, 147, 163.   "[I]n this context[, Plaintiff could] tolerate ordinary levels of supervision."   Tr. 115; *accord* Tr. 128; *see* Tr. 147 ("[S]he can tolerate ordinary levels of supervision."); *accord* Tr. 163.

As for Plaintiff's ability to adapt, the state agency psychological consultants opined that Plaintiff's "[s]tress tolerance [wa]s reduced however she [could] tolerate routine changes in the work environment."   Tr. 115; *accord* Tr. 128, 148, 164; *see also* Tr. 115, 128, 148, 164.

## V. HEARING TESTIMONY

At the hearing, Plaintiff testified that towards the end of her full-time job, she was missing work three to four times per month because she was too anxious to go in.  Tr. 45-46.  Plaintiff testified that she would have trouble being employed because she struggles to leave her home and would not be able to work a full eight-hour day on a regular basis.  Tr. 60, 69.  Plaintiff testified that she uses her ARMHS worker to go places and does not usually go out without her significant other or her ARMHS worker.  Tr. 60, 63.  Plaintiff additionally testified that her ARMHS worker helps her with "[e]verday life managing," including cleaning, phone calls, taking out the garbage, running errands, and depositing her rent payment.  Tr. 69.

Plaintiff testified that she uses an application on her phone for stress and anxiety, which she described as "kind of like an ARMHS worker in your pocket."  Tr. 66.  The application provided individual assessment, breathing and distraction exercises, and a support forum where users could check in with one another.  Tr. 66.  Plaintiff testified that she talked with others through the application on a daily basis.  Tr. 66.  Other than through

the application and with her significant other and mental-health professionals, Plaintiff did not talk to anyone else on a regular basis.  Tr. 67.  Plaintiff further testified that there has been "a lot of anxiety interacting with [her] siblings" since her mother passed away and she had a panic attack during the church service.  Tr. 67-68.

Plaintiff testified that she currently lived in an apartment with her teenage son.  Tr. Tr. 53-54.  Plaintiff testified that her significant other "visits when he can" and comes over "[a] couple of days a week."  Tr. 54.  Plaintiff and her significant other try to play tennis together.  Tr. 54.  Plaintiff testified that she experienced panic attacks "[q]uite a few times" and they would have to stop.  Tr. 54-55.

The ALJ asked about Plaintiff's volunteering at the local church.  Tr. 57.  Plaintiff testified that she volunteered "here and there," accompanying her mother when she decided to volunteer.  Tr. 57; *see* Tr. 56.  Plaintiff testified that "it could be anywhere from like half an hour, 45 minutes a week every two weeks."  Tr. 57.  Plaintiff testified that she volunteered for a few months and stopped because of "the anxiety of being around that many people, getting pulled in different directions, and interpreting would need to be done."  Tr. 57.

During the hearing, Plaintiff became tearful, which she explained was how she "relieve[d] stress."  Tr. 46.  Plaintiff's feet and lower body were also shaking.  Tr. 46.  At one point, the ALJ paused the hearing so that Plaintiff could take a break.  Tr. 56.

## VI. ALJ'S DECISION

The ALJ found that Plaintiff had the severe impairments of social anxiety disorder, generalized anxiety disorder, and major depressive disorder.  Tr. 13.  The ALJ further

concluded that Plaintiff did not have an impairment or combination of impairments that

met or medically equaled a listed impairment in 20 C.F.R. pt. 404, subpt. P, app. 1.  Tr. 14-

15.  The ALJ next concluded that, Plaintiff had

> the residual functional capacity to perform a full range of work
> at all exertional levels but with the following nonexertional
> limitations: limited to simple, routine repetitive tasks; simple
> work related decisions and routine workplace changes;
> occasional interaction with coworkers and supervisors; and no
> work involving tandem tasks; and no interaction with the
> general public.

Tr. 16.

In reaching this residual functional capacity, the ALJ "gave significant weight" to

the opinions of the state agency psychological consultants as to the "moderate social and

maintain concentration, persistence, or pace limitations."  Tr. 20.  The ALJ noted that "[t]he

subsequent evidence did not demonstrate worsening of [Plaintiff's] conditions.  To the

contrary, [Plaintiff's] mental conditions have been fairly well controlled with medication

and support from ARMHS and her specialized mental health care became less and less

frequent."  Tr. 20.  The ALJ "note[d] that more weight could not be assigned to the[ir]

opinions as they used the former Part B and C criteria, but moderate limitations in

interacting with others and in concentrating, persisting, or maintaining pace is consistent

with . . . [their opinions]."  Tr. 20-21.  The ALJ also "added greater social limit[ation]s and

elaborated upon their mental residual functional capacities to make the terms more

vocationally applicable."  Tr. 21.

The ALJ "gave little weight to" Kuehl's opinion.  Tr. 21.  The ALJ explained that

"the marked to extreme limit[ation]s are not entirely consistent with the record which

shows that while [Plaintiff] has anxiety and panic attacks, she also goes to the gym, volunteers, goes to museums, uses public transportation and has worked as a bartender during the relevant period." Tr. 21. The ALJ noted that "[t]he mental status exams and clinical observations were not generally consistent with [Kuehl's] opinion although [Plaintiff] was, at times, tearful." Tr. 21. The ALJ additionally noted that Plaintiff "did not seem to have panic attacks at clinic visits where she was often described to be alert, fully oriented, and in no acute distress." Tr. 21. The ALJ further observed that "[c]onservative treatment and basic psychotropic medications also appeared to improve [Plaintiff's] symptoms . . . ," allowing her to "get out and do more activities such as doing yardwork for distraction, going cross-country skiing, and going to her mother's and aunt's house." Tr. 21.

The ALJ likewise observed that, "had [Plaintiff] been as limited as this opinion represents, one would typically see far more intensive treatment with more specialized providers," yet Plaintiff "did not have a psychiatrist during the period." Tr. 21. The ALJ recognized that, "while [Plaintiff] did have an [intensive residential treatment services] placement, her symptoms leading to the placement did not persist for any 12-month duration." Tr. 21. Finally, the ALJ pointed out that "Kuehl did not provide much explanation for the limits he espoused and he checked the box indicating he did not know whether [Plaintiff's] conditions could be expected to last at least 12 months," but "had been seeing [Plaintiff] for several years at that point" and "did not provide any explanation for that answer and the apparent internal inconsistency." Tr. 21.

Based on the testimony of the vocational expert, the ALJ found that Plaintiff was able to perform the representative jobs of night cleaner, rack room worker, and trimmer. Tr. 22-23.  Accordingly, the ALJ concluded that Plaintiff was not under a disability.  Tr. 23.

## VII. ANALYSIS

This Court reviews whether the ALJ's decision is supported by substantial evidence in the record as a whole.  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).  "[T]he threshold for such evidence is not high."  *Id.*  "It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.* (quotation omitted); *see, e.g.*, *Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018) (defining "substantial evidence as less than a preponderance but enough that a reasonable mind would find it adequate to support the conclusion" (quotation omitted)).

This standard requires the Court to "consider both evidence that detracts from the [ALJ's] decision and evidence that supports it."  *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011).  The ALJ's decision "will not [be] reverse[d] simply because some evidence supports a conclusion other than that reached by the ALJ."  *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012).  "The court must affirm the [ALJ's] decision if it is supported by substantial evidence on the record as a whole."  *Chaney v. Colvin*, 812 F.3d 672, 676 (8th Cir. 2016) (quotation omitted).  Thus, "[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Perks*, 687 F.3d at 1091 (quotation omitted); *accord Chaney*, 812 F.3d at 676.

Disability benefits are available to individuals who are determined to be under a disability. 42 U.S.C. §§ 423(a)(1), 1381a; *accord* 20 C.F.R. §§ 404.315, 416.901. An individual is considered to be disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A); *see also* 20 C.F.R. §§ 404.1505(a), 416.905(a). This standard is met when a severe physical or mental impairment, or impairments, renders the individual unable to do her previous work or "any other kind of substantial gainful work which exists in the national economy" when taking into account her age, education, and work experience. 42 U.S.C. § 423(d)(2)(A); *accord* 42 U.S.C. § 1382c(a)(3)(B); *see also* 20 C.F.R. §§ 404.1505(a), 416.905(a).

Disability is determined according to a five-step, sequential evaluation process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

> To determine disability, the ALJ follows the familiar five-step process, considering whether: (1) the claimant was employed; (2) she was severely impaired; (3) her impairment was, or was comparable to, a listed impairment; (4) she could perform past relevant work; and if not, (5) whether she could perform any other kind of work.

*Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010). In general, the burden of proving the existence of disability lies with the claimant. 20 C.F.R. §§ 404.1512(a), 416.912(a).

### A. Residual Functional Capacity

A claimant's "residual functional capacity is the most [she] can do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1); *accord* 20 C.F.R. § 416.945(a)(1); *see McCoy v. Astrue*, 648 F.3d 605, 614 (8th Cir. 2011) ("A claimant's [residual functional capacity] represents the most he can do despite the combined effects of all of his credible limitations and must be based on all credible evidence."); *see also, e.g.*, *Schmitt v. Kijakazi*, ___ F. 4th ____, 2022 WL 696974, at *5 (8th Cir. Mar. 9, 2022). "Because a claimant's [residual functional capacity] is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Perks*, 687 F.3d at 1092 (quotation omitted); *accord Schmitt*, 2022 WL 696974, at *5.

At the same time, the residual-functional-capacity determination "is a decision reserved to the agency such that it is neither delegated to medical professionals nor determined exclusively based on the contents of medical records." *Norper v. Saul*, 964 F.3d 738, 744 (8th Cir. 2020); *see Perks*, 687 F.3d at 1092; *see also* 20 C.F.R. §§ 404.1546(c), 416.946(c). "An ALJ determines a claimant's [residual functional capacity] based on all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [his or her] limitations." *Combs v. Berryhill*, 878 F.3d 642, 646 (8th Cir. 2017) (quotation omitted); *accord Schmitt*, 2022 WL 696974, at *5; *Norper*, 964 F.3d at 744-45. As such, there is no requirement that a residual-functional-capacity determination "be supported by a specific medical opinion." *Schmitt*, 2022 WL 696974, at *5 (quotation omitted). Nor is an ALJ "limited to considering medical evidence exclusively." *Id.* (quotation omitted).

Accordingly, "[e]ven though the [residual-functional-capacity] assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner." *Perks*, 687 F.3d at 1092 (quotation omitted); *accord Schmitt*, 2022 WL 696974, at *5; *see* 20 C.F.R. §§ 404.1546(c), 416.946(c).

### B. Weight Given to Kuehl's Opinion

Plaintiff challenges the little weight assigned by the ALJ to the opinion of Kuehl, her treating psychologist. Plaintiff argues that the ALJ applied an improper standard of review and, because the ALJ improperly discounted Kuehl's opinion, the residual-functional-capacity determination does not incorporate all relevant limitations, including "her inability to remember work-like procedures, maintain attention, deal with work stress, and absenteeism." Pl.'s Mem. in Supp. at 9, ECF No. 35. As a result, Plaintiff argues that the ALJ's residual-functional-capacity determination is not supported by substantial evidence on the record as a whole and the conclusion that she is able to perform other work is likewise unsupported.

There is no dispute that Kuehl is an acceptable medical source who treated Plaintiff. *See* 20 C.F.R. §§ 404.1502(a)(2) (identifying licensed psychologists as acceptable medical sources), 416.902(a)(2) (same), 404.1527(a)(2) ("Treating source means your own acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you."), 416.927(a)(2) (same).[14] A treating source's "opinion is entitled to controlling weight when

---

[14] Plaintiff's applications were filed before March 27, 2017. *See generally* 20 C.F.R. §§ 404.1527, 416.927.

it is supported by medically acceptable techniques and is not inconsistent with substantial evidence in the record." *Julin v. Colvin*, 826 F.3d 1082, 1088 (8th Cir. 2016); *accord Cline v. Colvin*, 771 F.3d 1098, 1103 (8th Cir. 2014).

"Yet[, this controlling] weight is neither inherent nor automatic and does not obviate the need to evaluate the record as a whole." *Cline*, 771 F.3d at 1103 (citation and quotation omitted). The opinions of treating sources "are given less weight if they are inconsistent with the record as a whole or if the conclusions consist of vague, conclusory statements unsupported by medically acceptable data." *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004); *see Cline*, 771 F.3d at 1103 (permitting the opinions of treating physicians to be discounted or disregarded "where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions" (quotation omitted)). When a treating source's opinion is not given controlling weight, the opinion is weighed based on a number of factors, including the examining relationship, treatment relationship, opinion's supportability, opinion's consistency with the record as a whole, specialization of the provider, and any other factors tending to support or contradict the opinion. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Shontos v. Barnhart*, 328 F.3d 418, 426 (8th Cir. 2003). The ALJ is required to "give good reasons" for the weight assigned to a treating source's opinion. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Cline*, 771 F.3d at 1103.

### 1. Improper Standard of Review

Plaintiff contends that the ALJ applied an improper standard of review when she concluded that Kuehl's "marked to extreme limitations [we]re *not entirely consistent* with

the record." Tr. 21 (emphasis added). According to Plaintiff, the regulations' not-inconsistent language "is much different." Pl.'s Mem. in Supp. at 12; *see* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

The relevant regulations, §§ 404.1527 and 416.927, make repeated reference to considerations of an opinion's consistency with other evidence in the record when determining the weight to be assigned to that opinion. They provide a treating source's opinion will be given controlling weight when it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is *not inconsistent* with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2) (emphasis added); *accord* 20 C.F.R. § 416.927(c)(2). They also provide that "the more *consistent* a medical opinion is with the record as a whole, the more weight" generally assigned to that opinion. 20 C.F.R. § 404.1527(c)(4) (emphasis added); *accord* 20 C.F.R. § 416.927(c)(4).

Here, the ALJ stated that she "considered the opinion evidence in accordance with 20 CFR 404.1527 and 416.927." Tr. 16. The ALJ's express reference to the relevant regulations and discussion reflecting a consideration of how consistent Kuehl's opinion was with other evidence in the record demonstrates that she considered Kuehl's opinion within the proper framework.

### 2. Substitution of Own Judgment

Plaintiff argues that the ALJ substituted her own judgment for that of a trained medical professional when she discounted Kuehl's opinion based on the results of mental status examinations and clinical observations as well as Plaintiff's conservative course of treatment. According to Plaintiff, in doing so, "the ALJ is saying that she has a better

understanding of the signs and symptoms [Plaintiff] displayed than the doctor actually recording [Plaintiff's] signs and symptoms."  Pl.'s Mem. in Supp. at 13.

It is well established that "an ALJ may discount a treating source opinion that is unsupported by treatment notes."  *Aguiniga v. Colvin*, 833 F.3d 896, 902 (8th Cir. 2016); *see, e.g.*, *Anderson v. Astrue*, 696 F.3d 790, 794 (8th Cir. 2012) (no error in "minimal weight" assigned to treating neurologist's opinion where "the significant limitations [neurologist] expressed in his evaluation are not reflected in any treatment notes or medical records"); *Martise v. Astrue*, 641 F.3d 909, 925 (8th Cir. 2011) ("An ALJ may justifiably discount a treating physician's opinion when that opinion is inconsistent with the physician's clinical treatment notes." (quotation omitted)); *Davidson v. Astrue*, 578 F.3d 838, 843 (8th Cir. 2009) ("It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes.").

In assigning little weight to Kuehl's opinion, the ALJ correctly observed that Plaintiff "did not seem to have panic attacks at clinic visits where she was often described to be alert, fully oriented, and in no acute distress" and the "[t]he mental status examinations and clinical observations were not generally consistent with [Kuehl's] opinion although [Plaintiff] was, at times, tearful."  Tr. 21.  While Plaintiff was routinely described as depressed and anxious, treatment notes reflect that she was consistently engaged along with largely normal mental status examinations, including normal speech, normal thoughts, normal attention/concentration, and no memory impairment.  These observations were inconsistent with Kuehl's opinion that, for example, Plaintiff was not able to remember work-like procedures and maintain attention for a two-hour segment and

was seriously limited in her abilities to understand, remember and carry out short, simple instructions and make simple work-related decisions. *See, e.g.*, *Aguiniga*, 833 F.3d at 902 (opinion of physician treating claimant's anxiety appropriately considered where "ALJ gave [physician's] opinions some weight where it was warranted, and discounted it when it was contradicted by a lack of evidence or was undermined by contrary evidence in the treatment notes"); *Anderson*, 696 F.3d at 794 (no err in giving less weight to opinion of treating physician where "the significant limitations [physician] expressed in his evaluation are not reflected in any treatment notes or medical records"); *Halverson*, 600 F.3d at 930 (treating psychiatrist's opinion properly discounted where "multiple mental status examinations, including examinations performed by [treating psychiatrist] revealed no abnormalities, and [claimant] was repeatedly noted to be alert and oriented with normal speech and thought processes").

Similarly, when considering the degree of limitation espoused by Kuehl, the ALJ did not err by taking into account Plaintiff's overall course of treatment, including the fact that "[c]onservative treatment and basic psychotropic medications . . . appeared to improve [Plaintiff's] symptoms" and she was not under the care of a psychiatrist. Tr. 21; *see id.* ("In addition, had [Plaintiff] been as limited as this opinion represents, one would typically see far more intensive treatment with more specialized providers."). *See Mabry v. Colvin*, 815 F.3d 386, 391-92 (8th Cir. 2016); *see also Turpin v. Colvin*, 750 F.3d 989, 993 (8th Cir. 2014) (impairments controllable by treatment or medication are not disabling). And, on balance, the ALJ did not ignore the fact that there was a period of time in which Plaintiff

was in an intensive residential treatment services program, noting that the "symptoms leading to the placement did not persist for any 12-month duration." Tr. 21.

The ALJ properly gave little weight to Kuehl's opinion when it was undermined by his treatment notes and the treatment Plaintiff received was "effective in reducing and minimizing the functional limitations stemming from her conditions." Comm'r's Mem. in Supp. at 9, ECF No. 38.

### 3. Ability to Sustain Work-Like Activities

Plaintiff additionally argues that the ALJ "provided no explanation for her conclusion that [Plaintiff's] behavior and demeanor in a supportive, therapeutic environment, such as office visits with [Kuehl], translate to the ability to sustain work-like activities" and her ability to engage in some activities of daily living do not "serve as proof of the ability to sustain work activities." Pl.'s Mem. in Supp. at 14-15.

Plaintiff is correct that the Eighth Circuit Court of Appeals "has repeatedly stated that a person's ability to engage in personal activities such as cooking, cleaning or a hobby does not constitute substantial evidence that he or she has the functional capacity to engage in substantial gainful activity." *Singh v. Apfel*, 222 F.3d 448, 453 (8th Cir. 2000) (citing *Kelley v. Callahan*, 133 F.3d 583, 588-89 (8th Cir. 1998)); *see also, e.g.*, *Hogg v. Shalala*, 45 F.3d 276, 278 (8th Cir. 1995) ("We have repeatedly stated that the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work."). A claimant's residual functional capacity "must be based on a claimant's ability to perform the requisite physical

acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." *McCoy*, 648 F.3d at 617 (quotation omitted).

When determining the weight to be assigned to Kuehl's opinion, the ALJ was required to consider the opinion in the context of the entire record. *See* 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4); *Bernard v. Colvin*, 774 F.3d 482, 487 (8th Cir. 2014) ("Since the ALJ must evaluate the record as a whole, the opinions of treating physicians do not automatically control."). When a treating source opines that a claimant has greater limitations than the claimant "actually exhibits in her daily living, an ALJ need not ignore the inconsistency." *Anderson*, 696 F.3d at 794; *see also, e.g.*, *Fentress v. Berryhill*, 854 F.3d 1016, 1021 (8th Cir. 2017); *Davidson*, 501 F.3d at 990-91. And, an ALJ properly discounts the opinion of a treating source when that opinion is "contradicted by or inconsistent with other evidence in the record." *Howe v. Astrue*, 499 F.3d 835, 841 (8th Cir. 2007); *accord Julin*, 826 F.3d at 1088 (opinions of treating physicians "may be given limited weight if they are . . . inconsistent with the record").

Here, the ALJ observed that, while Plaintiff experienced "anxiety and panic attacks, she also goes to the gym, volunteers, goes to museums, uses public transportation, and has worked as a bartender during the relevant period," activities which were inconsistent with "the marked to extreme limits" opined by Kuehl. Tr. 21. *See, e.g.*, *Goff v. Barnhart*, 421 F.3d 785, 792 (8th Cir. 2005) ("Working generally demonstrates an ability to perform a substantial gainful activity."). The ALJ similarly observed elsewhere in the decision that Plaintiff performed "a number of daily activities requiring a high degree of skill in [concentrating, persisting, or maintaining pace]," including "volunteering at her church,

34

cooking meals from scratch, taking care of her son, using public transportation, and handling her own finances." Tr. 15; *see, e.g.*, Tr. 359, 362, 367 (caring for son); Tr. 360, 367, 368 (cooking); Tr. 361, 369 (managing own finances). The ALJ likewise observed, among other things, that Plaintiff played tennis at the local YMCA with another resident "on an almost daily basis" when participating in the intensive residential treatment services program and went hunting. Tr. 15. Further, the ALJ observed that Plaintiff's treatment improved her symptoms to the extent that she was able "to get out and do more activities such as doing yard work for distraction, go cross-country skiing, and go[] to her mother's and aunt's house[s]." Tr. 21; *see, e.g.*, Tr. 1306 (cross-country skiing); 1314-15 (working on mother's farm and doing yard work for aunt); Tr. 1330 (spending time helping her mother and deer hunting); Tr. 1337 ("helping family members around their house and fixing household needs").

The ALJ did not err in considering the nature of Plaintiff's daily activities as one factor when assigning little weight to the marked and extreme limitations opined by Kuehl, particularly in light of other medical evidence in the record, including Kuehl's own treatment notes, showing that Plaintiff was consistently engaged and had largely normal mental status examinations. *See Milam v. Colvin*, 794 F.3d 978, 984 (8th Cir. 2015); *Ponder v. Colvin*, 770 F.3d 1190, 1195-96 (8th Cir. 2014) (per curiam); *see also Fentress*, 854 F.3d at 1021.

### 4. Other Inconsistency

In addition to the inconsistencies discussed above, the ALJ also noted that Kuehl "checked a box indicating he did not know whether [Plaintiff's] conditions could be

expected to last at least 12 months." Tr. 21.  The ALJ noted that Kuehl "had been seeing [Plaintiff] for several years at that point," yet "did not provide any explanation for that answer and the apparent internal inconsistency." Tr. 21.  "A treating [source's] own inconsistency may also undermine his opinion and diminish or eliminate the weight given his opinions." *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006); *accord Milam*, 794 F.3d 983.  The inconsistency between the length of time Kuehl had treated Plaintiff and his response as to the expected duration of Plaintiff's conditions was an additional valid basis for discounting the weight assigned to Kuehl's opinion.

In sum, the Court concludes that the ALJ gave good reasons for assigning little weight to Kuehl's opinion and the ALJ's treatment of Kuehl's opinion is supported by substantial evidence in the record as a whole.

### C. Reliance on Vocational Expert

Lastly, Plaintiff asserts that "the testimony of the vocational expert does not constitute substantial evidence on which to base a denial of [her] claim for benefits" because the ALJ's determination of her residual functional capacity was improper.  Pl.'s Mem. in Supp. at 16.  Plaintiff's argument is based on her contention that the ALJ erred by not including all of the limitations opined by Kuehl in her residual functional capacity.  As just discussed, the Court has concluded that the ALJ gave good reasons for assigning little weight to Kuehl's opinion and the ALJ's treatment of Kuehl's opinion is supported by substantial evidence in the record as a whole.  "An ALJ must include 'only those impairments and limitations [s]he found to be supported by the evidence as a whole in h[er] hypothetical to the vocational expert.'" *Nash v. Commissioner, Social Sec. Admin.*, 907

F.3d 1086, 1090 (8th Cir. 2018) (quoting *Perkins v. Astrue*, 648 F.3d 892, 902 (8th Cir. 2011)).  An ALJ is "not required to include other limitations in the hypothetical that [s]he found to be unsupported in the record." *Perkins*, 648 F.3d at 902.  Because the ALJ found the marked and extreme limitations opined by Kuehl were not supported by the record as a whole, she was not required to include them in the hypothetical posed to the vocational expert.

## VIII. ORDER

Based upon the record, memoranda, and the proceedings herein, and for the reasons stated above, **IT IS HEREBY ORDERED** that:

1. Plaintiff's Motion for Summary Judgment, ECF No. 34, is **DENIED**.

2. The Commissioner's Motion for Summary Judgment, ECF No. 37, is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated: March___22___, 2022                     _____*s/ Tony N. Leung*_____
                                               Tony N. Leung
                                               United States Magistrate Judge
                                               District of Minnesota


                                               *Peggy C. O. v. Kijakazi*
                                               Case No. 20-cv-1373 (TNL)